UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

    Plaintiff,

v.                                                Criminal Case No. 13-20356

Mack Allen Mitchell,                Honorable Sean F. Cox

    Defendant.
_____/

## **OPINION & ORDER**

In this action, Defendant Mack Allen Mitchell ("Defendant" or "Mitchell") is charged with possession with intent to distribute controlled substances. The matter is currently before the Court on Defendant's Motion to Suppress Evidence. In this motion, Mitchell asks the Court to suppress narcotics that were seized from a vehicle he was driving on January 3, 2013. An evidentiary hearing was held on July 12, 2013, and July 15, 2013, and the Court also heard oral argument at that time. In addition, the parties filed supplemental briefs following the evidentiary hearing. For the reasons explained below, the Court shall GRANT the motion.

## **BACKGROUND**

In this action, Mitchell is charged with one count of possession with intent to distribute controlled substances (cocaine), in violation of 21 U.S.C. § 841(a)(1). The charges stem from a warrantless search of a vehicle that Mitchell was driving on January 3, 2013.

Mitchell filed the instant Motion to Suppress on May 23, 2013. (Docket Entry No. 12). In this motion, he asks the Court to suppress the narcotics that were found in the vehicle he was driving on January 3, 2013. Mitchell contends that he did not give the officers consent to search

1

the vehicle and that the officers did not have probable cause to search or seize the vehicle.

The Government filed a brief opposing the motion on May 30, 2013, (Docket Entry No. 13) asserting that the Court should deny the motion because: 1) the officers conducted a lawful traffic stop of the vehicle for a traffic ordinance violation (improper window tinting) and because Officer Tanguay had information from a confidential informant that Defendant was conducting narcotics business from the vehicle (*see* Govt.'s Br. at 3); and 2) after the vehicle was stopped, "Officer Husckestin performed a K-9 sniff of the outer area of the vehicle" and "[t]he dog gave a positive indication for narcotics, at which time the K-9 entered the interior of the vehicle" and then gave a positive indication for narcotics in certain areas of the vehicle. (*Id.*). The Government contends the officers had probable cause to search the vehicle and that, as a result, it was permissible for the officers to seize the vehicle and perform an x-ray search at another location.

With the issues so framed by the parties, this Court held an evidentiary hearing on July 12, 2013, and July 15, 2013. The Government called the following individuals as witnesses at the evidentiary hearing: 1) Officer Jay Tanguay; 2) Officer Robert Huckestein; and 3) Sergeant Roy Harris. The Defense cross-examined the Government's witnesses and also called Mitchell to testify for the limited purpose of the Motion to Suppress Evidence.

One exhibit was admitted at the hearing, a surveillance videotape,[1] that was obtained from the gas station where the events at issue took place.

Following the evidentiary hearing, the Court ordered supplemental briefing by the parties. Thereafter, both the Government and Mitchell filed supplemental briefs. (*See* Docket

---

[1] The videotape has no audio.

Entry Nos. 18, 19 & 20).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having observed the video evidence and the witnesses who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law.[2]

## FINDINGS OF FACT

Officer Jay Tanguay has been employed by the Detroit Police Department for fourteen years. On January 3, 2013, Officer Tanguay was assigned to narcotics and was working a shift with Officer Robert Huckestein.

Officer Tanguay had investigated Mitchell prior to that time and had previously impounded the same vehicle at issue in this case back in 2010. No drugs were found in the vehicle at that time.

Officer Huckestein has been employed by the Detroit Police Department for approximately seventeen years. Officer Huckestein has received specialized training and certification in order to work as a canine handler with the Police Department.

Officer Huckestein testified regarding the training that his canine has received. The initial training for the canine patrol dog is approximately six months. The dog also receives ongoing training throughout its career. The dog is approximately eight years old. Officer Huckestein and the dog train together on a weekly basis. The dog is certified today and the dog

---

[2]To the extent that a finding of fact is more properly a conclusion of law, and the to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

was certified on January 3, 2013. Officer Huckestein has been working with this dog for almost five years. The dog is a trained patrol dog that is specifically trained, among other things, to look for narcotics. The dog is trained to indicate that he has found narcotics by scratching the area where the narcotics are found and/or by barking and wagging his tail. Officer Huckestein has found the dog to be reliable in finding narcotics in the past.

On January 3, 2013, Officer Tanguay and Officer Huckestein were driving together in Officer Huckestein's fully marked police car, which is a Chevy Tahoe. Officer Huckestein had his trained dog with him.

Officer Huckestein's vehicle is equipped with a camera and audio equipment, which was working on January 3, 2013. The recordings are only maintained for a period of sixty to ninety days. The recording from the patrol car was not produced in this action. Although a request was made for the tape, the recording was no longer available.

On January 3, 2013, Officer Tanguay and Officer Huckestein performed a traffic stop on the vehicle that Mitchell had been driving, a white Chevy Trailblazer. The tinting on the front window appeared to violate an applicable ordinance.

Officer Tanguay had received, on some unspecified date prior to January 3, 2013, information from a confidential informant that Mitchell uses that vehicle to supply narcotics. Officer Tanguay testified that he has used this confidential informant in the past and the information that had previously been provided to Officer Tanguay from this individual had proved to be truthful and credible.

Officer Tanguay saw Mitchell driving the vehicle on January 3, 2013. Mitchell was the only person in the vehicle. By the time the officers approached the vehicle, Mitchell had parked

it at a Sunoco gas station at Eight Mile and Mitchell Street in Detroit, Michigan. The Sunoco gas station has a surveillance video camera that shows the general area where Mitchell's vehicle was parked on January 3, 2013.

When the officers arrived at the station, Mitchell had already parked the vehicle at a gas pump, exited the vehicle, and entered the gas station store. As Mitchell exited the vehicle, he shut the drivers-side door and the vehicle doors locked. The vehicle's rear lights activated briefly when the doors locked.

After exiting their vehicle, the officers approached Mitchell as he was leaving the gas station store and returning to his vehicle. Mitchell was stopped approximately six to eight feet behind the vehicle he had been driving. Officer Tanguay asked Mitchell if the white SUV was his and Mitchell responded that it was. Officer Tanguay advised Mitchell that he was being stopped for a traffic violation. Officer Tanguay told Mitchell to put his hands up and Mitchell complied. Officer Tanguay then performed a pat-down search of Mitchell, and went inside his pockets. Officer Tanguay did not feel anything during the pat-down search that he thought was contraband or a weapon. Officer Tanguay removed the keys to the vehicle from Mitchell's pockets. Officer Tanguay handcuffed Mitchell.

Officer Tanguay then walked to the driver's side of the vehicle Mitchell had been driving and unlocked the vehicle's doors, which activated the vehicle's rear lights briefly. Officer Tanguay opened the driver's-side door to the vehicle. He then entered the vehicle for approximately a minute and twenty seconds, during which time he searched for any weapons that could threaten officer safety and for contraband.

While Officer Tanguay was searching the vehicle, Mitchell remained approximately six

5

to eight feet behind the rear of the vehicle, with Officer Huckestein.

Mitchell did not give the officers consent to search the vehicle at any time.

The interactions between Mitchell and the Officers were cordial. Mitchell was calm and cooperative.

Officer did Tanguay did not find any weapons or contraband during his search of the vehicle. When Officer Tanguay left the vehicle after searching its interior, he left the driver's side door open.

Officer Tanguay then returned to a location towards the rear of the vehicle, where Mitchell and Officer Huckestein were standing.

Officer Huckestein then approached Mitchell's vehicle. The driver's side door was still open and Officer Huckestein briefly went inside the vehicle, for approximately ten seconds, and searched for weapons or anything else that could harm the dog. After he did that, the driver's side door still remained open.

Mitchell was still handcuffed after both Officer Tanguay and Officer Huckestein had searched the vehicle for weapons and contraband and had found none.

Mitchell was later taken further away from the vehicle, while still hand-cuffed, to a location that was out of reach of the video camera.

After retrieving his trained canine, Officer Huckestein then walked up to the driver's side of the vehicle with the dog. The driver's-side door was still open. As Officer Huckestein and the dog walked toward the open door, Officer Huckestein observed that the dog's body language began to change and Officer Huckestein then released the dog and "told him to go get it," at which point the dog jumped inside the vehicle. Once inside the vehicle, the dog indicated for the

presence of narcotics by the dashboard area of the vehicle.

Officer Huckestein testified the he did not perform an exterior perimeter search of the vehicle with the dog because he "didn't get that far."

After the dog gave a positive indication for narcotics while inside the vehicle, Officer Huckestein brought the dog out and advised Officer Tanguay that the dog had given a positive indication for narcotics. Officer Tanguay then went into the vehicle again and performed another search of the interior of the vehicle for approximately five minutes. Officer Tanguay did not locate any narcotics or weapons during that search. After Officer Tanguay told Officer Huckestein that he did not find anything in the vehicle, he asked Officer Huckestein to re-deploy the dog again inside the vehicle. Officer Huckestein did so and the dog again gave a positive indication for the presence of narcotics in the dashboard area of the vehicle.

After that second positive indication from the dog, Officer Tanguay searched the vehicle again but did not find any narcotics. The officers decided to let Mitchell go, removed the handcuffs from him, and told Mitchell he was free to leave. They did not issue Mitchell a citation for improperly tinted windows.

The two officers then went back in to their vehicle and left the scene. As they were driving away from the scene, Officer Tanguay talked to his commanding officer, Sergeant Roy Harris. Officer Tanguay advised Sergeant Harris that the dog had indicated positive for narcotics but no narcotics were found when the vehicle was searched. Sergeant Harris advised Officer Tanguay to go back to the scene, confiscate the vehicle, and have it x-rayed at customs. The officers then turned around and went back to the gas station. Officer Tanguay told Mitchell that they were going to impound the vehicle and that he would be notified of the proceedings.

Officer Tanguay then entered the vehicle and drove it to bridge x-ray facility at customs. Officer Huckestein followed him. At the bridge facility, an x-ray was performed on the vehicle and cocaine was ultimately found behind the radio in the dashboard area of the vehicle and another location in an overhead area by the driver's side window. The narcotics founds were tagged and kept for evidence.

## ANALYSIS & CONCLUSIONS OF LAW

There does not appear to be any dispute that the officers had probable cause to stop Mitchell for driving a vehicle with excessively tinted windows that violated the applicable ordinance. Despite the existence of probable cause to conduct a traffic stop, however, the search at issue also must be justified under an exception to the warrant requirement. *United States v. McCraney*, 674 F.3d 614, 618 (6th Cir. 2012). As noted by the Sixth Circuit in *McCraney*:

> We begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 507, 19 L.Ed.2d 485 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

*McCraney*, 674 F.3d at 618.

Of the recognized exceptions, the Government asserts that several apply here. Each will be addressed below.

**1. The Initial Interior Searches Of The Vehicle By The Officers Were Not Valid Searches Made Incident To Arrest.**

To the extent that the Government asserts that the initial searches of the vehicle by the Officers were valid searches made incident to arrest, that argument is foreclosed by *Gant*. In *Gant,* the Supreme Court clarified that the Sixth Circuit and other circuits had incorrectly

8

understood prior precedents to allow a vehicle search incident to the arrest of a recent occupant even if there was no possibility that the arrestee could gain access to the vehicle at the time of the search. *McCraney*, 674 F.3d at 619. In *Gant,* the Supreme Court held that police are authorized to search a vehicle incident to arrest only if: 1) the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search, or 2) it is reasonable to believe the vehicle contains evidence of the offense of arrest. *Id.* Neither of the above apply here.

The first circumstance that would warrant a search of the vehicle incident to an arrest of Mitchell would be if Mitchell were unsecured and within reaching distance of the passenger compartment at the time of the search. He was not. At the time of the initial searches by the officers, Mitchell was handcuffed and was standing about six to eight feet behind the rear of the vehicle.

The second circumstance that would warrant a search of the vehicle incident to an arrest of Mitchell is if it was reasonable to believe the vehicle contains evidence of the offense of arrest. This too does not apply. Mitchell was not actually arrested. Moreover, the Government does not claim that the officers entered the vehicle because the officers believed it would contain evidence of the offense at issue – improperly tinted windows. And there was no testimony that would support such an assertion.

Thus, to the extent that Government argues that the searches by the officers prior to an indication by the drug dog were permissible because they were made incident to arrest, that argument is rejected.

**2.     Under The Totality Of The Circumstances, The Officers Did Not Have Reasonable Suspicion To Justify A Protective Search Of The Vehicle.**

The Government also argues that the Officers' initial entries in to Mitchell's vehicle (i.e., those before the canine entered the vehicle and alerted for narcotics) were constitutionally reasonable under *Michigan v. Long,* 463 U.S. 1032 (1983).

*Michigan v. Long* "authorizes a protective search of the passenger compartment where the officer 'possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *McCraney*, 674 F.3d at 620. That is, "[d]uring a *Terry* stop, *Long* allows officers to search an automobile's passenger compartment for weapons if the officers have a reasonable belief – 'based on specific and articulable facts' – that the suspect is dangerous and may 'gain immediate control of weapons.'" *United States v. Lurry*, 483 Fed. App'x 252, 254 (6th Cir. 2012).

In *McCraney*, the Sixth Circuit stated that a security sweep under *Long* "is permissible even if the suspect is detained outside the vehicle because 'if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then access to any weapons inside.'" *McCraney*, 674 F.3d at 620. Whether the requisite reasonable suspicion of danger existed "is determined from examination of the individual factors under the totality of the circumstances." *Id.*

Circumstances that may support a security sweep under *Long* include: 1) the defendant or others making furtive movements while inside the vehicle *(see, e.g., McCraney, supra*, at 621; *Lurry, supra*, at 254); 2) an officer visually observing the presence of shotgun shells or other items commonly associated with weapons *(see, e.g., Lurry, supra*, at 254); and 3) information

10

from an informant that the defendant carries a weapon (*see, e.g.*, *United States v. Ware*, 465 Fed. App'x 487, 494-95 (6th Cir. 2012)).

Under the totality of the circumstances here, the officers did not have reason to believe that Mitchell was dangerous or that he may gain immediate control of weapons upon being released. Upon being stopped by the officers, Mitchell was calm and cooperative and put his hands up as instructed. Officer Tanguay conducted a pat-down search and found no weapons, or any items commonly associated with weapons, on Mitchell's person. Mitchell was then handcuffed. Mitchell did not make any furtive movements inside the vehicle before he was approached by the officers, nor did he make any furtive movements while outside of the vehicle. The officers did not observe any weapons or ammunition prior to entering the vehicle and there was no testimony that the officers had been told by any confidential informant that Mitchell carries a weapon.

The only thing the Government points to as justifying a security sweep for weapons is that Officer Tanguay had received, on some unspecified date, information from a confidential informant that Mitchell was selling narcotics from his vehicle. The Government then asserts that individuals who engage in drug trafficking are known to carry weapons, and therefore the officers had a reasonable belief that Mitchell was dangerous and may gain immediate control of weapons. The Court rejects that argument.

Moreover, even if the officers were permitted to do a security sweep of the vehicle to look for weapons, they *each* conducted such a search and *found nothing*. Accordingly, this argument advanced by the Government, even if it were accepted by this Court, would not justify the subsequent warrantless canine search of the vehicle's interior.

**3.    The Officers Did Not Have Probable Cause To Search The Vehicle For Narcotics Based On Information From A Confidential Informant.**

Next, the Government asserts that the officers had probable cause to enter and search the interior of Mitchell's vehicle based on the information provided to Officer Tanguay by a confidential informant.

Probable cause has been defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion. *United States v. Padro*, 52 F.3d 120, 122-23 (6th Cir. 1995). The test for probable cause is whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Id*.. Determinations of probable cause are based on a review of the totality of the circumstances and involve a practical, common sense review of the facts available to the officer at the time of the search. *Id*.

As the Government notes, "[p]robable cause may come from a confidential informant's tip, *when sufficiently detailed and corroborated* by the independent investigation of law enforcement officer's." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (emphasis added). "The richness of detail provided by an informant increases the reliability of the information." *Padro*, 52 F.3d at 123.

Here, the confidential informant's tip was not sufficiently detailed and there is no credible evidence that the tip was corroborated by any independent investigation by the Officers.

Officer Tanguay testified that he had received, on some unspecified date prior to January 3, 2013, information from a reliable source that "Defendant uses that vehicle to supply narcotics."[3] That is the full extent of what this Court knows about the confidential informant's

---

[3]Office Tanguay did not indicate whether the informant identified Mitchell by name, photograph, or description and did not indicate how the vehicle was described or identified by

tip.

Perhaps most importantly, given that Officer Tanguay had previously investigated Defendant back in 2010, there is no evidence before this Court as to *when*, *or even what year*, the information from the confidential informant was received by Officer Tanguay. The tip may well have been stale by January 3, 2013. *See Marcilis v. Township of Redford*, 693 F.3d 589, 601 (6th Cir. 2012) (Noting that "[s]tale information cannot be the basis for establishing probable cause," and that in the context of drug crimes, information goes stale very quickly.)

Moreover, the information provided was very generalized and no predictive information was given. The confidential informant asserted only that Mitchell was trafficking narcotics out of his vehicle without providing any facts to support that allegation, such as when or where Mitchell was engaging in such conduct, where the drugs were stored inside the vehicle, the type of narcotics being sold, etc.

In addition, there is no evidence to indicate the *basis* of the confidential informant's knowledge (i.e., whether the information acquired by personal observations by the confidential informant or by second-hand information). *See Padro*, 52 F.3d at 124 (noting that informant's failure to state the basis of her knowledge severely undercuts her reliability).

And unlike cases such as *Arnold*, this is not a situation where the officers corroborated the tip from the confidential informant by any independent investigation. *See United States v. Arnold*, 442 Fed. App'x 207 (6th Cir. 2011) (where officers independently investigated and verified an informant's tip by conducting surveillance of the vehicle during which they observed

---

the informant.

13

conduct suggesting drug sales from the vehicle, had first hand observation of a phone call with the defendant arranging a controlled buy with the informant, and then observed the defendant drive to the location of the proposed drug deal.). Here, there is no credible evidence that the tip from the confidential informant was corroborated by any independent investigation by the Officers.

Considering the totality of the circumstances, this Court concludes that the information provided by the confidential informant was not sufficient to establish probable cause.

4. **The Canine Sniff Inside The Vehicle Violated The Fourth Amendment Because The Officers Opened The Door To The Vehicle And Facilitated The Dog's Sniff Of The Vehicle's Interior.**

In its opening brief, the Government took the position that the officers could search the interior of the vehicle based upon an alert from a trained narcotics canine who alerted to the presence of narcotics during an *exterior* perimeter search of the vehicle.

At the evidentiary hearing, however, Officer Huckestein testified the he did not perform an exterior perimeter search of the vehicle with the dog because he "didn't not get that far." That is, the dog entered the interior of the vehicle before an exterior search was conducted. Relying on *Sharp,* the Government nevertheless argues that the interior canine sniff did not violate Mitchell's Fourth Amendment rights because the interior dog sniff was not facilitated by the officers. The Court disagrees.

"It is well-established that 'a canine sniff is not a search within the meaning of the Fourth Amendment,' but 'the canine team must lawfully be present at the location where the sniff occurs.'" *United States v. Sharp*, 689 F.3d 616, 618 (6th Cir. 2012) (quoting *United States v. Reed*, 141 F.3d 644, 650 (6th Cir. 1998)). Here, Mitchell asserts that the narcotics detection dog

14

was not lawfully present because the officers did not have a warrant to search the vehicle and the search occurred in the inside of the vehicle.

In *Sharp*, the Sixth Circuit addressed a factual scenario where, during the course of performing an exterior search of a vehicle, a trained drug dog instinctively jumped into the vehicle through a window that was open when the officers arrived. The Sixth Circuit held "that a trained canine's sniff inside of a car after instinctively jumping into the car is not a search that violates the Fourth Amendment as long as the police did not encourage or facilitate the dog's jump." *Sharp*, 689 F.3d at 620. Citing *Winningham*, the court explained that "[i]n contrast, a dog sniff from the inside of a vehicle becomes a search that violates the Fourth Amendment when 'the officers themselves opened the door' and '*facilitate[d]* a dog sniff of the van's interior.'" *Sharp,* 689 F.3d at 619 (emphasis in original) (quoting *United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998)).

In *Winningham*, officers stopped a van because they believed it contained undocumented aliens. After stopping the vehicle, the officers opened the sliding door of the van and conducted a visual search of the interior. Despite finding no one inside the van, the officers left the door to the van open. The officers then waited five or six minutes for another officer with a trained canine to arrive. The canine handler started at the exterior of the front passenger side of the van. He noticed a difference in the dog's conduct as they reached the exterior of the rear of the van. At that point, the canine handler unleashed the dog. When the dog reached the open door, he jumped into the van and sniffed the interior, eventually alerting at a rear vent where the officers found narcotics. *Winningham*, 140 F.3d at 1329-30. The Tenth Circuit found the warrantless interior dog sniff unconstitutional. In doing so, the court noted that "the officers themselves

15

opened the door, allowing the van to sit on the side of the highway with the sliding door wide open for a period of at least six minutes" and when the trained canine arrived the dog handler "unleashed the dog as the dog neared the open door." Under such facts, the court found that a "desire to facilitate" (i.e., create the opportunity for) a dog sniff of the van's interior was readily apparent. *Id*. at 1331.

Here, the doors to Mitchell's vehicle were closed, and locked, when the officers arrived. The officers did not have a search warrant or Mitchell's consent to enter or search the vehicle. The driver's side door to the vehicle was unlocked and opened by Officer Tanguay and, after both Officers had separately entered the interior of the vehicle and performed brief searches, they each left the door open. Several minutes after Officer Tanguay had initially opened the door, Officer Huckestein retrieved his trained canine and walked up to the driver's side of the vehicle with the dog. The driver's side door was still open. As Officer Huckestein and the dog walked toward the open door, Officer Huckestein observed that the dog's body language began to change. Officer Huckestein then *released the dog* and *"told him to go get it,"* at which point the dog then jumped inside the vehicle. This Court concludes that the dog sniff from the interior of Mitchell's vehicle was in violation of the Fourth Amendment because the officers themselves opened the door to the vehicle and facilitated the dog's sniff of the vehicle's interior.

**5.     The Government Has Not Met Its Burden Of Establishing That The Inevitable Discovery Doctrine Applies Here.**

The Government contends that even if the trained canine was not permitted to enter Mitchell's vehicle, the narcotics would have been inevitably discovered by the dog.

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative

16

evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citation omitted). "The inevitable discovery doctrine, an exception to the exclusionary rule, allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *Kennedy*, 61 F.3d at 497 (citation omitted).

For the inevitable discovery doctrine to apply, "it must be demonstrated that the evidence inevitably would have been acquired through lawful means had the government misconduct not occurred." *Id*. The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence. *United States v. Lazar*, 604 F.3d 230, 240 (6th Cir. 2010). "Though some speculation as to how events would have unfolded, absent an illegal search, may be necessary, 'we must keep speculation at a minimum by focusing on *demonstrated historical facts capable of ready verification or impeachment*.'" *Id*. (quoting *United States v. Ford*, 184 f.3d 566, 577 (6th Cir. 1999)).

With the above principles in mind, the Court turns to the Government's argument. The Government asserts that:

> The canine in this case is a highly trained drug dog that has many years of service with the Detroit Police Department. Officer Huckestein testified to the skills and abilities of the canine, listing the various ways the canine detects and alerts to drugs and the many different locations where the canine has discovered narcotics. *Even if the Defendant's driver side door had been closed, it is highly likely that the canine would have detected narcotics from the exterior of the vehicle, given the dog's extensive training and abilities*. Accordingly, the narcotics would have been inevitably discovered, even if Defendant's vehicle door had been closed.

(Govt.'s Suppl. Br. at 10-11) (emphasis added). The Government, however, has not pointed to any demonstrated historical facts, or any testimony, that would support its assertion that the dog

17

would have detected narcotics had it performed an exterior perimeter search of the vehicle. The Court therefore concludes that the Government has not met its burden of establishing that the inevitable discovery doctrine applies here.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Mitchell's Motion to Suppress is GRANTED.

IT IS FURTHER ORDERED that the parties shall appear for a Status Conference in this matter on **August 14, 2013 at 11:00 a.m.**

IT IS SO ORDERED.

                                                  S/Sean F. Cox
                                                  Sean F. Cox
                                                  United States District Judge

Dated: August 8, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 8, 2013, by electronic and/or ordinary mail.

                                                    S/Jennifer McCoy
                                                  Case Manager